IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:04CV569-H

| | |
|---|---|
| MARY KAYLOR, )<br>      Plaintiff, )<br>)<br>vs. )<br>)<br>JO ANNE B. BARNHART, )<br>Commissioner of Social )<br>Security Administration, )<br>      Defendant. )<br>) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #11) and "Brief Supporting ... " (document #12), filed May 23, 2005; and the Defendant's "Motion For Summary Judgment" (document #15) and "Memorandum in Support of the Commissioner's Decision" (document # 16), both filed July 29, 2005. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Social Security benefits is supported by substantial evidence. Accordingly, the undersigned will <u>deny</u> Plaintiff's Motion for Summary Judgment; <u>grant</u> Defendant's Motion for Summary Judgment; and <u>affirm</u> the Commissioner's decision.

## I. PROCEDURAL HISTORY

On June 5, 2001, Plaintiff applied for Social Security Disability Insurance Benefits ("DIB"), alleging she became disabled on April 26, 2001, due to "no circulation in right leg." (Tr. 48). The

Plaintiff's claim was denied initially and on reconsideration.

The Plaintiff requested a hearing, which was held February 11, 2003. On June 26, 2003, the ALJ issued an opinion denying the Plaintiff's claim.

Subsequently, the Plaintiff timely filed a Request for Review of Hearing Decision. After receiving additional evidence, the Appeals Council denied her request for review on September 16, 2004, making the hearing decision the final decision of the Commissioner.

The Plaintiff filed this action on November 16, 2004, and the parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND

The Plaintiff testified that she was born on November 25, 1954, and was 48 years-old at the time of the hearing; that she was 5' 7" and weighed 240 pounds; that she was married and lived with her husband, son, and granddaughter; that she had completed the eighth grade; that she had last worked as a cook in a rest home; and that she also had worked for sixteen years as a knitter in a textile mill.

Regarding her medical and emotional condition, Plaintiff testified that she developed leg pain after she underwent a heart catherization; that she had developed gangrene on her right foot and had circulation problems in her right leg, which had required surgery; that although some circulation had returned post-surgery, she still had pain in her foot; that she also had significant swelling in her left foot; that she had a reaction to Darvocet and developed shingles characterized by sores all over her foot; that she went to a mental health clinic for therapy and medication because she had difficulty coping with her pain; that she could stand for 5 to 10 minutes; that walking from the car to the store was painful; that she slept in a recliner chair to alleviate her pain; that she did not want to be around

other people or go anywhere; that her doctor told her not to wear shoes; and that she took Ultram for pain, which did not help much.

Regarding her daily activities, the Plaintiff testified that she stayed home most of the day, sat in her recliner, and read and watched television; that she drove once per week; and that she did some housework and attended church at times.

A Vocational Expert ("V.E.") classified the Plaintiff's prior work history as medium and unskilled (cook) and light and unskilled (knitter).

The ALJ then presented the V.E. with the following hypothetical:

> taking into account [the Plaintiff's] age, education, and work experience ... [and] a residual functional capacity to perform certain sedentary work ... which would not require use of her right leg and foot for the operation of foot pedals or other activities, except for occasional standing and walking ... are there a significant number of ... unskilled jobs ... which she could successfully perform?

(Tr. 224-25.)

The V.E. testified that with these limitations, the Plaintiff could work as an assembler or an inspector, with 6,500 to 7,500 of those jobs available in North Carolina at the sedentary unskilled levels. Upon further questioning, the VE clarified that these jobs would performed almost entirely while seated.

The record also contains a number of representations by Plaintiff as contained in her various applications in support of her claims. On a Disability Report, dated July 15, 2001, Plaintiff stated that her disabling condition was caused primarily by "no circulation in right leg" (Tr. 48); and that she was unable to perform any housework  The Agency interviewer who took the report telephonically noted that the Plaintiff had no difficulty hearing, reading, breathing, concentrating, understanding, talking, answering, or thinking coherently.

On a Reconsideration Disability Report, dated December 11, 2001, Plaintiff stated that her condition was unchanged; and that the only restriction a doctor had placed on her activities was not to "force" herself to stand.

On an undated Claimant's Statement When Request for Hearing Is Filed, the Plaintiff stated that her condition was unchanged.

On June 25, 2001, Robert Pyle, M.D., a medical consultant for North Carolina Disability Determination Services ("NCDDS"), reviewed the Plaintiff's medical records and completed a "Request for Evaluation of Medical Severity," noting that on May 23, 2001, the Plaintiff had been diagnosed with an occluded right external iliac artery; that a repair of the artery was performed; that following the procedure, the ischemia in the Plaintiff's foot was resolving and the pulses were returning to normal; that the gangrenous skin around the Plaintiff's toes was healing; and that it was not expected that a toe amputation would be required. Dr Pyle further noted that on June 6, 2001, the Plaintiff reported to her doctor that she was doing well; that there were no signs of ischemia or claudication; and that Plaintiff's doctor opined that "everything is going to be OK." (Tr. 89.) Finally, Dr. Pyle concluded that the Plaintiff did not suffer a "severe impairment" as that term is used for Social Security purposes.

On November 2, 2001, Pitt Tomlinson, M.D., a NCDDS medical consultant, reviewed the Plaintiff's medical chart, including records that had been submitted since Dr. Pyle's evaluation, discussed above, and noted that there was no evidence of cellulitis or abscess in the Plaintiff's right foot; that her toes were healing; and that on August 20, 2001, the Plaintiff told her doctor that her right foot hurt only when she "bump[ed]" it, but that otherwise Plaintiff was doing "much better." Dr. Tomlinson also opined that the Plaintiff did not have a severe impairment.

Concerning the medical records that were submitted to the ALJ (at or after the hearing), neither party has assigned error to the his recitation of the medical records that he considered in rendering his decision. After carefully reviewing the medical chart, the undersigned adopts the ALJ's findings of fact as to those records, as follows:

> The medical records show that in April 2001, the claimant was evaluated for complaints of chest pain. By letter dated April 19, 2001, Dr. Douglas Boyette, a cardiologist, reported that the claimant's laboratories were satisfactory except for high cholesterol. The claimant's cardiac catherization showed proximal 10-20% stenosis in the LAD with minimal luminal irregularities in the proximal right coronary. The test was otherwise completely normal. Dr. Boyette stated that it was extremely unlikely that the claimant was having cardiac pain and suspected that she had musculoskeletal pain (Exhibit 4F).
>
> On May 5, 2001, the claimant presented to an emergency room for evaluation of right arm pain and lesions on her right foot. The claimant was diagnosed with herpes roster of the right foot and a contusion of the right shoulder (Exhibit 5F). On May 15, 2001, the claimant was admitted to the hospital for an abdominal aortogram with distal runoff. The claimant had complained about pain in the right leg and foot associated with swelling in the calf and knee which occurred after she underwent a heart catherization. The claimant was diagnosed with pseudoaneurysm in the right common femoral artery and underwent a graft replacement of that artery. The claimant was also diagnosed with gangrene of the right toe (Exhibit 7F). As of July 2001, Dr. D. B. Young, a treating primary care physician, reported that the claimant had almost complete healing of the big and little toes. Dr. Young also noted that the claimant had some claudication and her right heel became infected. As of September 2001, Dr. Young noted that the claimant's foot was doing much better and all of her lesions were almost healed. Further, Dr. Young stated that the claimant was still having pain and was unable to work due to that pain. Dr. Young advised the claimant that she could return to work "whenever her pain let her" (Exhibit 6F).
>
> In December, 2001, Dr. Young stated that the claimant had lots of complaints about her legs, some of which were due to claudication. Dr. Young added that the claimant's foot looked good. In March 2002, the claimant complained about right hip and leg pain. In April 2002, Dr. Young reported that x-rays of the hips revealed mild bilateral osteoarthritis. In September 2002, Dr. Young reported that the claimant had quite severe claudication and stated that he did not think that she was able to work because of her lifestyle inhibiting claudication. By letter dated January 6, 2003, Dr. Young stated that he thought the claimant was severely disabled primarily from peripheral vascular occlusive disease involving the main arterial supply to the right leg (Exhibit 9F).

> In May 2002, a team of mental health professionals evaluated the claimant and concluded that she had a depressive disorder, NOS. In October 2002, Dr. Thomas Kearney, a psychiatrist, evaluated the claimant, and concluded that she had dysthymia and an anxiety state. Dr. Kearney noted that the claimant reported that she was able to get around fairly well and although she was not too worried about her physical state, she remained depressed and anxious. (Exhibit 10F). In January 2003, Ms. Estelle Long Brown, a mental health nurse practitioner, reported that the claimant was not sleeping well. The claimant also reported that she was doing well on Celexa. Ms. Brown prescribed Trazadone to help the claimant sleep (Exhibit 15F).

(Tr. 16-17.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was therefore whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[1] The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to this proceeding; that the Plaintiff suffered "peripheral vascular

---

[1] Under the Social Security Act, 42 U.S.C. §301, et seq., the term "disability" is defined as an:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

occlusive disease involving the main arterial supply to her right leg, status post gangrene of the toe, and a depressive disorder," which were severe impairments within the meaning of the Regulations; but that Plaintiff's impairment or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that Plaintiff was unable to perform her past relevant work; that due to her alleged mental and emotional impairments, the Plaintiff was limited to unskilled work; that Plaintiff had the residual functional capacity "to perform sedentary unskilled work which does not require the use of foot pedals with the right foot or other use except for occasional standing and walking"; and that the Plaintiff was a "younger individual" with a "limited education." (Tr. 20-21.)

The ALJ then correctly shifted the burden to the Defendant to show the existence of other jobs in the national economy which the Plaintiff could have performed. The ALJ concluded that the VE's testimony, which was based on a hypothetical that factored in the above limitations, provided substantial evidence that there <u>were</u> a significant number of jobs in the national economy that the Plaintiff could perform and that, therefore, she was <u>not</u> disabled.

The Plaintiff essentially appeals the ALJ's determination of her residual functional capacity ("RFC"). <u>See</u> Plaintiff's "Motion for Summary Judgment" (document #11) and "Brief Supporting ..." (document #12). The Plaintiff's assertion of error is without merit, however, that is, substantial evidence supports the ALJ's conclusions regarding the Plaintiff's residual functional capacity.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20

C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged impairments limited her ability to work. Although Agency medical evaluators concluded that the Plaintiff did not suffer any severe impairments that would have a duration of 12 months or more, the ALJ found that the Plaintiff suffered three severe impairments: "peripheral vascular occlusive disease involving the main arterial supply to her right leg, status post gangrene of the toe, and a depressive disorder." Accordingly, the ALJ concluded that the Plaintiff could not perform her past relevant work as a cook or a knitter and found her not disabled based on a residual functional capacity to perform unskilled sedentary work not requiring the use of foot pedals with the right foot or otherwise except for occasional standing and walking.

Notably, the Plaintiff does not assign error to the ALJ's determination that Dr. Young's opinion that the Plaintiff was disabled was not entitled to controlling weight. Moreover, the Court finds that the ALJ's conclusion concerning Dr. Young's opinion was supported by substantial evidence.

The Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at

178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

The ALJ considered Dr. Young's opinion that Plaintiff was disabled due to pain in her right leg and foot. However, as the ALJ correctly noted, this opinion was not supported Dr. Young's treatment record or any objective testing. Specifically, Dr. Young did not identify any specific limitations that Plaintiff was experiencing and did not place any restrictions on her activities, other than instructing her to return to work whenever she felt she was able to do so. Finally, Dr. Young expressly noted that he was giving his opinion at the Plaintiff's request and in support of her claim for disability benefits.

The remainder of the undisputed medical record supports the ALJ's essential conclusion that the Plaintiff suffered, but was not disabled by, peripheral vascular occlusive disease involving the main arterial supply to her right leg, status post gangrene of the toe, and a depressive disorder. The May 2001 repair of the Plaintiff's right femoral artery was successful, that is, the ischemia subsided, pulses returned in her foot, and amputation was not required. Later, the Plaintiff told her doctor that her foot hurt only if she bumped it.

As for Plaintiff's alleged mental and emotional limitations, Dr. Kearney, a psychiatrist, who evaluated the Plaintiff in October 2002, noted that Plaintiff stated that she was able to get around "fairly well" and was not "too worried" about her physical condition. Although Dr, Kearney diagnosed the Plaintiff as suffering depression and anxiety, he never placed restrictions on her activities or otherwise opined that her ability to work was limited in any way. In January 2003, the Plaintiff told Ms. Brown, a mental health nurse practitioner, that she was not sleeping well. Later, the Plaintiff reported, however, that she was doing well on her medications, including Trazadone that helped her to sleep. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994)

(evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965).

The record also establishes that the Plaintiff engaged in significant daily life activities during the subject period, such as performing some household chores, watching television, reading, driving, and attending church; and that Plaintiff was also able to perform basic cognitive and physical tasks. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed house work, which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation

must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's peripheral vascular occlusive disease involving the main arterial supply to her right leg, status post gangrene of the toe, and a depressive disorder – which could be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in Craig. However, the ALJ also correctly evaluated the "intensity and persistence of [her] pain, and the extent to which it affects [her] ability to work" and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on with moderate daily activities, that is, Plaintiff's ability to take care of her personal needs, do some household chores, drive, and attend church, as well as the objective evidence in the medical records, discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles v. Shalala, 29 F.3d 918, 923 (4th Cir. 1994), citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the Plaintiff's residual functional capacity.

## V. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. "Plaintiff's Motion For Summary Judgment" (document #11) is **DENIED**; Defendant's "Motion for Summary Judgment" (document #15) is **GRANTED**; and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED.**

**Signed: August 23, 2005**

_Carl Horn, III_
_____

Carl Horn, III
United States Magistrate Judge